954 So.2d 261 (2007)
Deona L. CYRUS, et al., Plaintiffs-Appellants
v.
U.S. AGENCIES INSURANCE COMPANY, et al., Defendants-Appellees.
Takeisha Sumler, Plaintiff-Appellee
v.
State Farm Mutual Automobile Insurance Company, et al., Defendants-Appellees.
Nos. 41,826-CA, 41,827-CA.
Court of Appeal of Louisiana, Second Circuit.
March 14, 2007.
*262 William Edward Armstrong, Monroe, for Plaintiff-Appellant, Deona L. Cyrus.
Hayes, Harkey, Smith & Cascio, by Harry McClellan Moffett, IV, Monroe, for Defendant-Appellee, Deona L. Cyrus.
Street & Street, by Daniel Randolph Street, Monroe, for Plaintiff-Appellee, Takeisha Sumler.
Hudson, Potts & Bernstein, L.L.P., by Mark Jeffrey Neal, Ethan A. Hunt, Monroe, for Defendants-Appellees, U.S. Agencies Casualty Insurance Company, Inc. and Shelly M. Ridley.
Gregory George Elias, Monroe, for Defendant-Appellee, Shelley M. Ridley.
Before DREW, MOORE and LOLLEY, JJ.
DREW, J.
In her appeal, the left-turning motorist complained that the trial court erred in finding her 100% at fault in causing the collision that totaled both vehicles and resulted in personal injuries and other damages to both drivers and a guest passenger. Our review of this record shows that the assessment of 100% fault on the left-turning motorist was manifestly erroneous. Both drivers were inattentive. Therefore, the judgment of the trial court is amended to cast the southbound driver with 50% of the responsibility in causing this collision while reducing the fault of the left-turning motorist to 50%.

FACTUAL AND PROCEDURAL BACKGROUND
At 11:15 p.m. on July 17, 2004, Deona Cyrus was traveling north on Warren Drive (a four-lane street) in West Monroe and turned left across the two southbound lanes into Johnny's Pizza store. Shelley Ridley and Takeisha Sumler, her guest passenger, were driving south on Warren Drive and collided with the Cyrus vehicle in the outside southbound lane. Neither driver nor the guest passenger saw the other vehicle prior to the crash. Cyrus contended Ridley was operating her car *263 without headlights, a claim disputed by Ridley and her passenger.
The left-turning motorist, Cyrus, and Mona Menyweather, owner of the Cyrus vehicle, sued Ridley, who reconvened against Cyrus and State Farm Mutual Automobile Insurance Company for her damages. Ridley's passenger, Sumler, sued both Cyrus and State Farm along with Ridley and U.S. Agencies Casualty Insurance Company for her damages. Sumler and U.S. Agencies dismissed their appeal with prejudice in this court on November 2, 2006, since they settled. The file also contains a letter from State Farm stating State Farm dismissed its appeal at the trial level. Therefore, this appeal is limited to Cyrus's complaint about being held 100% at fault.

TESTIMONY
Michael J. Rigal, a detective with the West Monroe Police Department, stated he investigated the accident and recorded what he learned in his accident report[1] which stated that the headlights of Ridley's southbound vehicle were not on. Cyrus did not see the Ridley vehicle and turned left across the southbound lanes to enter a parking lot. The left front corner and left front fender of the Ridley vehicle struck the front and left front corner of the Cyrus car. Impact was in the outside southbound lane. Rigal cited Ridley for careless operation for driving without headlights.
The officer testified:
 He had no independent recollection of the accident and relied upon his accident report which contained "pretty much exactly" what the two drivers told him.
 If Ridley had denied her lights were off, he would have included that in his report and would not have written her a citation; the officer did not independently recall whether Ridley or her passenger told him her headlights were on or off.
 He did not recall checking the light switch position on the Ridley vehicle, his normal procedure in a dispute.
 Cyrus, Ridley, and Sumler were taken by ambulance to the hospital.
 Cyrus told him she did not see the Ridley car which had no headlights.
 The report did not state that the officer interviewed Sumler, the passenger in the Ridley car, although Rigal said he would have talked to Sumler.
 As an accident investigator, his job was to ascertain what happened but not to determine fault.
 He estimated that the collision occurred 350 feet south of the intersection with Wellerman Road, but the distance could have been less; a nursing home is located between the intersection and the accident scene on the same side of the street. The other side of the street was residential.
 The streetlights in the area were operating and the Johnny's Pizza sign at the scene gave light to the parking lot and the street.
 The Ridley car was moving straight down the street and the Cyrus car turned left across the path of Ridley's car.
 The collision was not low impact and the Ridley vehicle was pushed onto the shoulder/sidewalk next to the street.
Deona Cyrus testified she was driving to Johnny's Pizza from her home and turned *264 left into the parking lot when she was struck by the Ridley car which had no headlights. Cyrus stated:
 Because she did not see the Ridley car before the crash, she concluded that Ridley's headlights were not on.
 The very hard impact damaged the front left side of her car, which was totaled in the collision.
 Her head hit the steering wheel and her left knee hit the dashboard.
 The air bags did not deploy.
 She sustained additional injuries to her lower left back, her left neck, and left ankle. She had pain from the July accident until Christmas.
 She opined that the area was not well lighted and said the street lights illuminated the sidewalks. The Johnny's Pizza sign illuminated the side of the sign only.
 While waiting to turn into Johnny's, Cyrus let one southbound vehicle pass, looked and did not see another car before she turned left into Johnny's.
 Following the July 17 accident, Cyrus's treating physician, Dr. Warren Daniel, released her to work on August 18, 2004. Cyrus described herself as 60% well at that point.
 The same day Dr. Daniel released Cyrus, she was in another accident and continued treatment with her doctor. Cyrus stated she did not re-injure any of the areas hurt in the July crash but injured her right knee, for which she received treatment for about a week.
Cynthia Bond, a night delivery driver at Johnny's, had traveled south on Warren Drive and turned right into the Johnny's lot just prior to the impact. When turning, Bond noticed Cyrus's vehicle was stopped and signaling a left turn into Johnny's Pizza. Bond saw no vehicles behind her on Warren. She estimated that five to fifteen seconds after turning in, she heard the impact as she was reaching into her back seat for her pizza bags. She immediately went inside to call for police and ambulance assistance. She spoke briefly with Cyrus before leaving for another delivery. According to Bond, the Cyrus vehicle had on lights and turn signal while the Ridley car had no lights, front or back. After impact, the Ridley car moved south, jumped the curb and came to rest on some bushes in the Johnny's lot.
Shelley Ridley testified that she left work at the nursing home about a block from Johnny's Pizza. She turned right onto Wellerman Road and right onto four-lane Warren Drive. Moving at about 25 mph, Ridley did not see Cyrus's vehicle, which she struck in the outside southbound lane without applying her brakes. Her passenger, Takeisha Sumler, did not give any type of warning before the wreck. Ridley testified both that her headlights were not on when her car came to rest in front of Johnny's Pizza and that the lights were on when she was pulled out of her car after the crash. Ridley said neither she nor anyone else turned off the manually-operated lights after the accident. She did not recall if the police officer questioned her about her headlights.
Ridley stated on direct examination that she started her car, put on her seat belt, and turned on her lights with her left arm. After stopping at the red light at the intersection and seeing no traffic, she turned right on red from Wellerman onto Warren. Following the crash, all she remembered was a man assisting her from her car and speaking to ambulance personnel. Her testimony was that her first conversation with the officer was when he gave her the ticket in the emergency room for having no lights. Ridley stated she told him her lights were on but the officer left. At her deposition a year earlier, Ridley stated she *265 believed the officer asked her at the scene if her headlights were on and she told him that the lights were on. Ridley's car was totaled in the accident. She stated she had low back injury, although her medical records referred to neck and shoulder injuries.
Takeisha Sumler, Ridley's guest passenger, testified at trial that she saw Ridley push or pull a button to turn on the headlights. She contradicted her assertion at the pretrial deposition that she knew the lights were on but never saw Ridley do anything. Sumler then explained at trial she thought the lights came on automatically and she noticed the lights reflecting off a building. Sumler never saw the Cyrus car before impact, as she was picking up her keys from the floor. While acknowledging there were street lights and the Johnny's Pizza lighted sign, Sumler did not think there was enough light for someone to drive without headlights. At her previous deposition, she stated there was sufficient light to see. At trial, Sumler was positive Ridley's lights were on. Sumler's account was that Ridley's vehicle was in the left inside, southbound lane when the wreck occurred.

REASONS FOR JUDGMENT
The trial court decided that:
 Ridley's headlights were on prior to impact, notwithstanding Bond's testimony that Ridley's lights were off after the wreck.
 Ridley could not have traveled the distance from her place of employment to the point of impact without noticing her lights were off.
 Cyrus failed to prove that Ridley's lights were off.
Among the reasons cited by the trial court were Sumler's testimony that she observed the headlights reflecting off the building as they were leaving work. Based upon its familiarity with the area of the collision and the five- to fifteen-second delay from Bond's turning until she heard the crash, the court speculated that Ridley may not have turned off Wellerman Road onto Warren when Bond turned into the Johnny's parking lot. The trial court also noted that the policeman estimated the distance from the Wellerman Road intersection to Johnny's was 350 feet but it could have been less.
The trial court dismissed Ridley's failure to see the Cyrus vehicle prior to the collision because Ridley was on a favored street and Cyrus had a higher duty of care as a left-turning motorist. Based upon Cyrus's not having preempted the favored traffic, the amount of damage, and the distance traveled by the Ridley vehicle after impact, the trial court found Cyrus to be solely at fault. The trial court awarded Ridley $5,000.00 in general damages and special damages of $5,926.30 for medicals, property damage, and lost wages.

FAULT
In Toston v. Pardon, XXXX-XXXX (La.4/23/04), 874 So.2d 791, 799-800, the supreme court reversed this court's 100% assessment of fault to the drunk driver and re-allocated the fault between the driver and DOTD. The supreme court explained:
The initial inquiry to determine if a party may be liable under the duty-risk analysis is cause-in-fact. A party's conduct is a cause-in-fact of the harm if it was a substantial factor in bringing about the harm. The act is a cause-in-fact in bringing about the injury when the harm would not have occurred without it. While a party's conduct does not have to be the sole cause of the harm, it is a necessary antecedent essential to an assessment of liability.

*266 Whether an action is the cause-in-fact of the harm is a factual determination that is left to the factfinder. This court posited a two-part test for the appellate review of facts:
(1) The appellate court must find from the record that there is a reasonable factual basis for the finding of the trial court, and
(2) The appellate court must further determine that the record establishes that the finding is not clearly wrong or manifestly erroneous.
When the district court has allowed both parties to present their experts before making its factual determinations, the factfinder's choice of alternative permissible views cannot be considered to be manifestly erroneous or clearly wrong. However, where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness's story, the court of appeal may find manifest error even in a finding purportedly based on a credibility determination. (Citations omitted.)
Notwithstanding the deference due the factual findings of the trier of fact, our examination of this record reveals manifest error in casting Cyrus with 100% fault for the wreck. No reasonable view of the evidence supports this result. The trial court disregarded the significant and disinterested testimony of both the investigating officer, who arrived a minute after the accident, and Bond, the independent witness, who saw no headlights behind her as she drove south and turned into Johnny's Pizza. Bond also observed Ridley's car with no lights while it was still in motion after the crash.
In addition to stating headlights on the Ridley vehicle were off when he arrived, the officer testified that his practice was to ask drivers if their headlights were on. The officer frankly admitted he had limited recollection of the event and properly relied upon his accident report in testifying. La. C.E. art. 803(5). Had Ridley replied her headlights were on, the officer stated he would have noted the dispute in his report and, according to his normal procedure, he would not have issued Ridley a citation for careless operation due to driving without headlights. The officer said his report was written while fresh on his mind based upon his conversations with the drivers and his conclusions.
Ridley herself gave contradictory testimony about her interactions with the policeman at the scene; she indicated at her deposition she believed that the officer asked whether her lights were on, while at trial she stated the only time she saw the policeman was at the hospital. In spite of the officer's testimony about his normal investigative techniques and practices and his frank admission of his limited memory of this particular accident, the trial court concluded the officer failed to speak to Ridley, a conclusion that is not supported by this record.
The trial court also erred in interjecting its personal "extra judicial familiarity" with the accident area in deciding that Ridley could not have traveled from her work to the accident site without realizing her lights were off. The trial court also improperly speculated that the reason the witness, Bond, did not see Ridley's headlights was because Ridley had not turned onto Warren Street when Bond turned into Johnny's Pizza. The officer's estimation that the distance from the intersection to Johnny's Pizza was 350 feet or perhaps less belied this theorization. The trial court improperly made factual findings *267 based upon its personal perceptions[2] of the relevant streets. In addition to relying on personal speculation, the trial court ignored relevant disinterested testimony in favor of contradictory testimony about Ridley's headlights. The conclusions that Ridley's headlights were illuminated and that Cyrus was solely at fault in the accident were manifestly erroneous.
Having found the trial court was clearly wrong in finding Cyrus 100% at fault and in failing to find Ridley at fault, we re-allocate fault as instructed by the supreme court in Toston v. Pardon,[3] 874 So.2d at 803.
After an appellate court finds a clearly wrong apportionment of fault, it should adjust the award, but only to the extent of lowering or raising it to the highest or lowest point respectively which is reasonably within the trial court's discretion. In applying the manifest error standard of review to the factfinder's allocation of fault in Watson v. State Farm Fire & Casualty Ins. Co., 469 So.2d 967, 974 (La.1985), this court stated as follows:
In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed.
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties. (Citation omitted.)
In Slagel v. Roberson, 37,791 (La.App. 2d Cir.11/18/03), 858 So.2d 1288, 1290-1291, writ denied, XXXX-XXXX (La.3/12/04), 869 So.2d 824, this court explained:
Before attempting a left turn, a motorist should ascertain whether it can be completed safely. In a vehicular collision case, plaintiffs are afforded the benefit of a presumption of the defendant's negligence when they prove that the defendant executed a left hand turn and crossed the center line at the time of the impact. The burden rests on the motorist who desires to make a left turn to explain how the accident occurred and to show that he is free from negligence.
Likewise, jurisprudence has established that an oncoming driver has a right to assume that the left-turning motorist will obey the law in allowing him to continue in his proper lane of travel and will yield to his right-of-way.

*268 Nonetheless, all motorists on Louisiana highways must drive with due regard for the traffic on the highway and have an affirmative duty not to drive faster than is reasonable and prudent under the conditions and potential hazards existing at the time. La. R.S. 32:64(A). Thus, notwithstanding the presumption of negligence attributed to a left-turning driver, a favored motorist can still be assessed with comparative fault if his substandard conduct contributed to the cause of the accident.
Pursuant to Watson v. State Farm Fire & Casualty Ins. Co., 469 So.2d 967 (La.1985), the trier of fact will compare the relative fault of the parties in the assessment of liability. The law of comparative negligence is applicable to situations involving automobile accidents. The allocation of fault is a factual determination subject to the manifest error rule.
A court of appeal should not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong. The task of a reviewing court is to assess whether the fact finder's resolution of conflicting evidence was reasonable in light of the record as a whole.
(Citations omitted.)
Both drivers stated that neither saw the other vehicle until impact. Neither took evasive action. Both were inattentive. Neither driver saw what she should have seen and that failure on both their parts resulted in this crash. Cyrus, the left-turning driver, admittedly failed to yield the right of way to the southbound Ridley and turned into Ridley's path. Even if we were to assume that Ridley's headlights were not illuminated, Cyrus was on a lighted street with her own headlights to assist her. Clearly, she should have seen Ridley's car and avoided the wreck. We agree with the trial court's finding that her negligence was a cause of this crash.
Ridley's inattention, like Cyrus's, amounted to careless operation of her vehicle because she failed to drive her car in a careful and prudent manner. See La. R.S. 32:58. It is undisputed that Cyrus's headlights and turn signal were operating. Ridley admitted she never saw Cyrus's car and did not apply her brakes before impact. Had Ridley maintained a proper lookout and seen what she should have seen, the accident could have been avoided. Cyrus's stopped car had to move across the entire inside southbound lane before impact in the outside southbound lane. Even though Ridley was in the favored lane of travel, Ridley's failure to see this lighted vehicle move into her path was substandard conduct and an equal contributing factor to this mishap.
In summary, had either of these drivers seen what she should have seen, this accident could have been avoided.

DAMAGES
Where a fact finder does not reach an issue because an earlier finding disposes of the case, the appellate court must make a de novo determination of undecided issues from the facts in the record. This court must make a fair and just award to Cyrus for damages established in the record. Holt v. Bethany Land Co., 36,888 (La.App. 2d Cir.4/9/03), 843 So.2d 606.
At trial Cyrus introduced into evidence without objections and by stipulation her medical records, her doctor's deposition and the following itemized medical expenses: hospital bill ($1,611.00), Dr. Warren Daniel's bill ($2,342.00), ambulance bill ($495.25), two Radiology Consultants bills (totaling $168.00), pharmacy bill ($319.30), and a medical records charge ($43.82). Her special medical expenses totaled *269 $4,953.57. Cyrus placed into the record proof of lost wages from Johnny's Pizza and the Dollar General Store of $597.50 plus deposition costs of $561.00, which included an expert witness fee of $400.00 for Dr. Daniel and $161.00 for the court reporter.
The parties also stipulated that Mona Menyweather sustained only property damage consisting of her $500.00 insurance deductible and $171.00 for car rental. Only Deona Cyrus filed this devolutive appeal, which did not include Mona Menyweather. Cyrus is (apparently on behalf of Menyweather) seeking to recover the $671.00 in property damage stipulated to have been sustained by Menyweather. Because Menyweather did not appeal the judgment, this court will not address that element of damages.
Following the accident, Cyrus was treated with medication and physical therapy and was released to return to work about a month after the accident. Cyrus testified that she had residual pain and problems from the July accident until about Christmas of that year. Under the circumstances presented, we award Cyrus $5,000.00 in general damages. In addition, Cyrus is granted special medical damages of $4,953.57, lost wages of $597.50, and deposition costs of $561.00.

DECREE
The judgment of the trial court is amended to reduce the allocation of fault against Deona Cyrus from 100% to 50% and to cast Shelley Ridley with 50% of the fault in causing this collision. The trial court's damage award to Shelley Ridley totaling $10,926.30 was not at issue in this appeal but is reduced by 50% to reflect Ridley's comparative fault. Deona Cyrus is awarded general and special damages of $11,112.07, as set out above; this award is reduced by 50% to reflect Cyrus's comparative fault in causing this accident. Cyrus and Ridley are to bear the costs of the appeal equally.
AMENDED AND RENDERED.
NOTES
[1] The accident report and accompanying diagram were filed into the record and incorporated as part of Cyrus's petition.
[2] See discussion in Elliott v. U.S. Fidelity & Guar. Co., 568 So.2d 155 (La.App. 2d Cir. 1990), stating that resolution of disputed issues of material fact by judicial notice is improper. Disputed facts are not in the same vein as the laws of nature, geographic and historical facts, time, laws and other matters of common knowledge.
[3] In the dissent in McElroy v. Wilhite, 39,393 (La.App. 2d Cir.5/18/05), 903 So.2d 627, Judge Caraway opines that the appellate court should give no deference to the trial court when it fails to find a co-tort-feasor negligent but notes that view was tacitly overruled by the supreme court in Toston v. Pardon, supra.